UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LELAND PARKER, *et al.*, | ) | |
| Plaintiffs/, | ) | |
| Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | 3:07 CV 336 |
| | ) | |
| RONALD L. HOSTETLER, *et al.*, | ) | |
| Defendants/ | ) | |
| Counterclaim Plaintiffs. | ) | |

<u>OPINION AND ORDER</u>

The plaintiffs/counterclaim defendants in this action are husband and wife Leland and Linda Parker, and a company owned and controlled by them, Lincoln Landmark Properties, Inc. (hereinafter "the Parkers"). The defendants are husband and wife Ronald and Gail Hostetler, and three companies wholly or partially owned and controlled by them, Hostetler Lawn & Landscaping, Inc., Gravel Lane, Inc., and Country Lane Development, LLC, (hereinafter, "the Hostetlers"). Linda Parker and Gail Hostetler are sisters, and the Parkers and the Hostetlers, as relatives sometimes do, went into business together in an endeavor to develop a large parcel of real estate into a residential subdivision. At first things went well, but when sales of lots slowed to a crawl, the partnership fractured, leading to this action, and to the parties' cross- motions for summary judgment.

The court provides a capsulized overview of the parties' claims and positions as a preface to the analysis that follows, and not as a statement of undisputed facts. The Parkers are residents of Arizona. As the Parkers see things, the Hostetlers—who are

residents of Indiana—proposed that the parties enter into a partnership to develop 109 acres of real estate located in Elkhart County, Indiana, into a residential subdivision called The Farm. The Parkers were to provide all of the money for the project–in terms that they characterize as loans—and the marketing and sales expertise. The Hostetlers were to perform/manage the manual labor and maintain the books. From the proceeds of lot sales the Parkers would be paid back their financial investment/loans, the Hostetlers repaid their equitable investment, and then profits would be split. Later the parties agreed to purchase an adjoining 37 acres of real estate to be developed as a subdivision called The Woods, under the same terms as for The Farm. The parties, and the court, will refer to the overall venture as "the Project," although in some cases the term "Project" may mean only The Farm or The Woods, with the lack of precision not of consequence to the discussion.

Slow sales caused financial stress, and the Hostetlers became concerned about their personal liability. To ease that concern, the Parkers agreed to the formation of a limited liability company by the Hostetlers, defendant/counter-plaintiff Country Lane Development LLC ("Country Lane"), to own, develop and sell lots in The Farm. Another limited liability company, Country Lane Development Group LLC ("Development Group") was formed by plaintiff Lincoln Landmark Properties, Inc. and defendant Gravel Lane, Inc. to do the same for The Woods. The cost of forming the two LLCs was paid from funds invested in the Project by the Parkers. Lincoln Landmark Properties and Gravel Lane (essentially, of course, the Parkers and the Hostetlers)

agreed to appoint Gail Hostetler as manager of the Development Group. Trusts were also formed to hold title to the real estate. The Fisher Trust held title to The Farm, the Signature One Trust held title to The Woods, and Gail Hostetler was the trustee of both trusts.

According to the Parkers, after the two LLCs were formed, the Hostetlers cut of communications with them and took steps which thwarted sales and marketing of lots in the Project. The Parkers demanded books and records, parts of which were eventually provided. At that time the Parkers formed the opinion that the Hostetlers had misappropriated significant funds from the Project for their personal use, and filed the present suit. The second amended complaint, as supplemented, contains nine counts alleging conversion; deception; breach of fiduciary duty; breach of trust by trustee; breach of trust by co-beneficiary; a declaratory judgment with respect to terms of the trust; anticipatory breach of contract; a declaratory judgment regarding the validity of an amended assignment; and breach of contract. (DE #92.)

The Hostetlers agree with the broad strokes above that they partnered with the Parkers to develop the Project, but they disagree as to most particulars of the parties' business relationship and conduct. For example, they deny that the Parkers' funds were a loan to the Project or that the Parkers' funds (instead the funds should be considered Project funds, albeit invested by the Parkers) were used to form the limited liability companies Country Lane and Development Group, and they deny that it was them who cut off communications and took actions which stalled sales. As they see it, the main

3

reason the controversy between the parties developed was because plaintiff Leland Parker failed to create a written partnership agreement or to memorialize any terms of the parties' agreement in writing' causing confusion and uncertainty.

Furthermore, they feel The Farm's liquidity was damaged because the Parkers abandoned their responsibilities to the Project and took $250,000 from the Farm's line of credit to purchase, for the Parkers' own benefit, an apartment complex in Missouri. According to the Hostetlers, the present case results from Parkers' filing a false and malicious lawsuit to cover up their own misconduct.

In their counter-complaint, the Hostetlers request a request a declaratory judgment establishing the scope of the parties' relationship(s), that is, whether a partnership exists and what its terms are; a dissolution of whatever relationship exists and a winding up of its affairs; a declaration that certain agreements signed on November 29, 2005, are void and unenforceable, or reformation of those agreements; damages for the Parkers' breach of fiduciary duties; damages for breach of contract and monies had and received; damages for fraud; and indemnification.

The Parkers have moved for partial summary judgment, seeking judgment in their favor on some of their claims against the Hostetlers and on some of the Hostetlers' claims against them. The Hostetlers have filed a cross-motion for partial summary judgment doing the same. The motions are not true cross-motions for summary judgment because they do not each address all of the same issues, but there is a great deal of overlap.

Summary judgment is of course to be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering the motion, the court must construe all of the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Laborers' Pension Fund v. RES Environmental Services, Inc.*, 377 F.3d 735, 737 (7th Cir. 2004). In a case involving cross-motions for summary judgment, that means that each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *See Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

In the discussion that follows, the court addresses the Parkers' motion first, incorporating discussion of the Hostetlers' cross-motion where possible. Following that, the court addresses matters raised only in the Hostetlers' motion. Any facts mentioned are undisputed facts, unless it is clearly stated otherwise.

**Issues Regarding the Agreements Executed November 29, 2005**

The Parkers have moved for summary judgment on Count III of the Hostetlers' counterclaim seeking reformation of documents and agreements signed on November 29, 2005. The essential terms of those documents are not in dispute. Simply put, the documents did the following: 1) removed Leland Parker's IRA (the original source of funds put into the Project) as a co-beneficiary of the Fisher Trust and made Ron

5

Hostetler the sole beneficiary of the Trust (specifically noting that the change was not intended to alter the original intent of the parties to split profits from The Farm 50/50) (DE #76-16); 2) characterized the funds that had been invested from Parker's IRA as a loan/revolving line of credit to the Fisher Trust and required payment of interest on those funds, at Parker's option, at either: i) a rate of 25% per annum, retroactive to May 7, 2003, the date retroactively affixed to the document, applicable to all funds transferred from Parker's IRA to the Trust from the retroactive date, or ii) 50% of the profit from all lots sold in The Farm, (DE #76-16; DE #76-17; DE #76-19 at ¶ 4); and 3) assigned all of Ron Hostetler's beneficial interest in the Trust to Leland Parker's IRA, ostensibly as collateral for the loan/revolving line of credit.[1] (DE #76-18; DE 76-19 at ¶ 5).

The Parkers' argument is short and simple: it is undisputed that neither of the Hostetlers read the agreements before signing them, and under Indiana principles of equity, a court will not grant reformation to a party who did not bother to read the agreement sought to be reformed. *Gierhart v. Consolidated Rail Corporation-Conrail*, 656 N.E.2d 285, 287 (Ind. Ct. App. 1995) ("equity should not intervene and courts should

---

[1] In other words, the 50% interest that RH had just received from the IRA was immediately assigned back to the IRA, along with his original 50% interest. Although there is evidence in the record that the parties may have intended this to be an assignment only to serve as collateral, see DE #76-9 at ¶ 5, as drafted it was an outright assignment of 100% of RH's beneficial interest. The difference between what may have been intended and what the documents actually did becomes more important later in considering a January 2007 amended assignment; in particular, to the Hostetlers' argument that there is no consideration for the January 2007 amendment.

not grant reformation where the complaining party failed to read the instrument, or, if he read it, failed to give heed to its plain terms."). It is undisputed that Ronald and Gail Hostetler both failed to read the agreements at issue. (R. Hostetler Dep. (DE #76-2) at 117:10-15, 138:9-19; Second Gail Hostetler Dep. (DE #76-2) at 69:12-70:2, 73:18-74:3.)

The Hostetlers' response[2] is that an overriding principle exists under Indiana law: reformation is available when there is a mistake by one party accompanied by fraud or inequitable conduct by the opponent. *See Carr Development Group, LLC v. Town of North Webster*, 899 N.E.2d 12, 13 (Ind. Ct. App. 2008).  More particularly, the Hostetlers assert that:

> where one party to a contract undertakes to draw up the contract in
> accordance with a previous understanding, but drafts the contract

---

[2] It should be noted, as the Parkers point out in their supplemental brief ((DE #130 at 8) that the Hostetlers plead in their final amended answer that Ron Hostetler signed without reading because he has a significant reading disability known to the Parkers. (DE #93 at ¶ 13). This argument has not been made in response to the Parkers' motion for partial summary judgment , however. Moreover, Mr. Hostetler made no such claim when deposed (and during his deposition read documents, was asked to take a document home and read it overnight, and the next day testified he had read it, (R. Hostetler Dep., (DE #110-3 at 141-42/5, 183-84/6), made no such claim in three prior answers, and is an assertion contrary to other items of record, such as him attesting that he had read and made corrections to the transcript of his deposition. Under the circumstances, making an assertion of reading disability in response to the Parkers' motion would appear to be an impermissible attempt to manufacture a factual dispute. See *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999) (noting "virtual unanimity" in circuits that parties cannot contradict prior sworn testimony without explanation); *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[A] party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." (citations and quotations omitted)). The only evidence of record of R. Hostetler's alleged reading disability is found in the affidavit of Gail Hostetler (DE #99-2 at ¶¶ 5,6), which is dated after all of the foregoing.

contrary to that understanding, and permits the other party to sign the contract without informing him that the contract is not in conformity with the previous understanding, such conduct on the part of the party preparing the contract is fraudulent.

(DE #98 at 4/11,[3] citing *People's Trust and Savings Bank v. Humphry*, 451 N.E.2d 1104, 1112 (Ind. Ct. App. 1983); *McNair v. Public Savings Insurance Co. of America*, 88 Ind. App. 386, 163 N.E. 290 (1928).) The Hostetlers have accurately summarized the holdings of the cases they cite, and they argue those cases apply here, because Leland Parker assured them that only minor changes were being made and that he:

> needed the new documents signed to make it look better for his own tax purposes and to "pass muster" with the IRS. Mr. Parker assured the Hostetlers that although he was going to call his IRA account "Lender" and Ron Hostetler "Owner" of the Fisher Trust, those changes would not change anything that was subject to the previous agreements between the parties. Mr. Parker repeated that they still had the 50/50 split and confirmed that fact in a document entitled "Modification to the Fisher Trust – Removal of Beneficial Interest[.]"

(DE # 98 at 4/11.[4]) Thus, the Hostetler's assert that a question of fact exists as to whether they were deceived by Leland Parker precluding a summary judgment against them on their reformation claim.

---

[3] Any citations herein to the record to pages in an "x/x" format are to internal page number in document/page number assigned by CM/ECF. If only one number is given, either they are the same or the document has no internal page numbers and it is the CM/ECF-assigned number.

[4] This summary of Leland Parker's representations is supported by Gail Hostetler's affidavit (DE #99-2 at ¶ 22) as well as both of the Hostetler's deposition testimony. *See, e.g.*, Dep. of R. Hostetler, DE #76-2 at 32/123 ("he [Leland Parker] said that nothing changes on anything, it's just that he had to change something for IRS purposes only.").

The Parkers' argument in reply is evidenced in the portion of the Hostetlers' response brief quoted above, and is that the Hostetlers were not taken advantage of because they admit that Leland Parker told them of the essential change being made by the documents: that Leland Parker's IRA would now become a lender of funds to the Fisher Trust:

> The rest of their agreement – the split of profits – would not change. [citation omitted.] There is no suggestion of any fraud based on the facts put forth by the Hostetlers – Mr. Parker revealed exactly what was in the contracts and explained what was changing and what was not changing.

(DE #108 at 3.)

As the court sees it, this argument misstates the extent of the changes made by the agreements, as does one of the agreements itself. The "Modification to The Fisher Trust Document" states: "The undersigned agree that this modification . . . **does not modify any returns anticipated or originally agreed to.** More specifically, all net profit from sales  . . . shall be divided equally [between the parties]." (DE #76-16) (emphasis added.) It is undisputed (or at least is a disputed fact which must be taken in the Hostetlers' favor) that the parties' original agreement was that funds invested in the Project would be on a "first in-first out" basis. (Aff. of G. Hostetler, DE #99-2 at ¶ 9; Parker Statement of Facts (DE #76 at ¶ 24 (*citing* First G. Hostetler Dep., DE #76-3, at 22/5 lines 22-24.) In other words, after sales began and expenses[5] were covered, Leland

---

[5] As to these expenses, however, Leland Parkers' IRA investment was to be repaid before work performed and billed by defendant Hostetler Lawn & Landscaping was repaid. (Ron Hostetler Dep., DE #76-2, at 47/20 lines 7-22.)

Parker's investment from his IRA would be reimbursed before the 50/50 split of profits would start.

It is undisputed that in 2003 Leland Parker placed approximately $157,000 from his IRA in the Fisher Trust. (Ron Hostetler Dep., DE #76-2, at 47/20, lines 7-22; Second G. Hostetler Dep., DE #76-7 at 206/ 22.) Assume that by January 1, 2010, Hostetler Lawn & Landscaping had billed $157,000 for services performed. Assume that by that date lot sales, after payment of all expenses other than Hostetler Lawn & Landscaping's bills, were $600,000. Under the terms of the parties' agreement, Leland Parker's IRA investment of $157,000 would have been repaid, and the landscaping bill of $157,000 would then have been paid, leaving $286,000 in profit to be split equally between the parties. The Hostetlers would walk away with $143,000 as their share of profits.[6]

After the November 29, 2005 amendments were signed, however, Leland Parker had the option on January 1, 2010, of electing—instead of 50% of the net profits as the interest due on his original investment recharacterized as a loan—interest on the $157,000 investment at a rate of 25% per annum assessed monthly from the date the funds were invested. (DE #76-17.) If Leland Parker chose that election, and assuming that his original $157,000 investment did not occur until December 31, 2003, simple math shows he would have been owed a sum of over $690,000.00. Instead of $143,000

_____

[6] This is one interpretation of the parties' intent. However, it appears possible that Parkers' IRA could have claimed entitlement to all of the profits, since R. Hostetler had assigned his complete beneficial interest in the Fisher Trust to the IRA. Effectively this is no different to the second hypothetical posed above in the text following this footnote.

the Hostetlers would receive nothing and possibly never receive anything. This is greatly different from Leland Parker's purported assertions that only minor changes were being made which would not impact the split of profits the parties originally agreed to, and the written statement in the "Modification to The Fisher Trust Document" which the court emphasized above, raising a material issue of ultimate fact as to whether Parker induced the Hostetlers to sign the agreements through inequitable conduct. The Parkers' motion for summary judgment will be denied as to the Hostetlers' reformation claim.

In the Hostetlers' cross-motion they argue that they should be granted a summary judgment declaring that the November 29, 2005, agreements are void because of a complete lack of consideration. Their argument, in sum and as already outlined above, is that Leland Parker assured them that the documents changed nothing and were being executed only for his personal purposes to satisfy IRS concerns, but instead had the effect of giving the Parkers the entire upside potential of the project, while putting all of the risk onto the Hostetlers. The Parkers' opposing argument is that ample consideration exists in the four corners of the documents, eliminating any need for parol evidence as to the parties' intent. The consideration was that Leland Parker gave up his (his IRA's) beneficial interest in the trust, assigning it to Ronald Hostetler, in exchange for a promise to repay the now-loan from the IRA, with interest, and Parker assumed the risk that such repayment might never occur.

The problem with this argument, as the Hostetlers argue, is that it is illusory. Contemporaneously with the Parker IRA assigning its beneficial interest to Ronald Hostetler, another agreement had Hostetler assigning 100% of his beneficial interest back to the IRA, leaving him potentially with nothing (not even a share of profits, see n. 6 *supra*) but an obligation to pay interest. It is not clear that was the parties' intent: another of the contemporaneous documents indicates that the assignment of Ronald Hostetler's entire interest was to be held as collateral, DE #76-17, and in January 2007, the parties executed an amended assignment ostensibly to make that clearer. Thus, there is a disputed issue of ultimate material fact: if Leland Parker simply made mistakes in drafting the documents (he is not an attorney) and they were not intended to deprive Ronald Hostetler of his entire beneficial interest, then consideration exists. On the other hand, if Leland Parker did intend to dupe Ronald Hostetler into entering agreements that deprived him of any beneficial interest in the Trust and any potential return, then consideration fails. Because of this factual dispute, the Hostetlers' motion for summary judgment on the issue of consideration will be denied.

**Fraud/Breach of Fiduciary Duty Issues**

*1. Regarding damages for tax liabilities*

The Parkers argue that they are entitled to summary judgment on the Hostetlers' fraud/breach of fiduciary duty claim seeking damages for tax liabilities. The elements of a fraud claim are: "(1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) which caused the complainant to

rely on the misrepresentation to the complainant's detriment." *Smith v. Taulman*, 20

N.E.3d 555, 566 (Ind. Ct. App. 2014). The elements of a breach of fiduciary duty claim

are: "(1) the existence of a fiduciary relationship; (2) a breach of that duty owed by the

fiduciary to the beneficiary; and (3) harm to the beneficiary." *Rapkin Group, Inc. v.

Cardinal Ventures, Inc.*,  29 N.E.3d 752, 757 (Ind. Ct. App. 2015) (*citing Farmers Elevator

Co. of Oakville, Inc. v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App.2010). Apparently

Indiana courts believe it implicit in the third element what Illinois courts—and the court

here—make explicit, that the harm must be proximately caused by the breach. *See, e.g.,

Neade v. Portes*, 193 Ill.2d 433, 444 (2000).

 The Hostetlers claim that the Parkers breached their fiduciary duties and

committed fraud in part by advising the Hostetlers that The Farm/Fisher Trust had no

tax reporting requirements (or none until profits were realized), which caused the

Hostetlers[7] to incur significant tax liabilities for the years 2004 and 2005 when the Fisher

Trust had income. The Parkers argue that they are entitled to summary judgment as to

damages based on a fraud/breach of fiduciary duty claim with respect to these tax

liabilities for a number of reasons:

 1. Statements regarding tax advice and planning are matters of law, and Indiana
does not recognize fraud claims based on a misrepresentation of law;

---

[7] Hostetler Lawn & Landscaping also incurred tax liabilities, and at one time the
Hostetlers included those as part of their claims. (*See* DE #52 at ¶ 46.) In their final
amended counterclaim (DE #93) they do not, however, and their cross motion for
summary judgment confirms that they seek damages only for their personal tax
liabilities. (DE #101 at 19/24.) Thus, the portions of the Parker's motion addressing
Hostetler Lawn & Landscaping's damages are moot and will not be discussed herein.

2. Fraud requires reasonable reliance, and the Hostetlers did not reasonably rely on any advice from L. Parker, because they failed to exercise reasonable prudence to protect themselves in a business transaction;

3. As to both claims, Gail H. conceded in her deposition that she did not rely on any tax advice given by Leland Parker, so there is no proximate cause;

4. The liabilities of an individual partner are not the same as the partnership's liabilities, and so the Parkers owed no fiduciary duty with respect to the Hostetlers' individual tax liabilities;

5. Even if some fiduciary duty was owed, it does not encompass holding Leland Parker to the same standard as an accountant or a lawyer.

First, as to the fraud aspect of the claim, it is black-letter law in Indiana that a fraud claim cannot be based on a misrepresentation of law. "It is true that in Indiana a misstatement of law normally does not constitute a representation upon which an action for fraud may be premised because the parties are presumed to know the law under which they live and thus are not protected from the consequences of relying upon a misstatement of the law." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 319 (Ind. Ct. App. 1991). The Parkers assert that giving tax advice constitutes the giving of legal advice, so the Hostetlers cannot base a fraud claim on any statements Leland Parker may have made regarding taxes. Although neither case the Parkers cite holds that giving tax advice always constitutes the giving of legal advice,[8] and obviously that is not true,

_____

[8] *American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 703-04 (Ind. Ct. App. 2004) (statements regarding tax deferral of qualified retirement plans and annuities were legal advice; *Scott*, 571 N.E.2d 313, 319 (Ind. Ct. App. 1991) (statements that investments in insurance plan were immediately tax-deductible were legal advice, but were actionable under circumstances of the case.)

because accountants give advice regarding taxes. The Hostetlers do not argue that the statements allegedly made were not legal statements, however.

Instead, the Hostetlers note that the cases cited by the Parkers show that exceptions exist to this rule where: 1) "a legal misrepresentation is premised upon factual misrepresentations" because the factual misrepresentations impair the "ability to correctly find and apply the law applicable to the facts," *Scott*, 571 N.E.2d at 319, 320; and 2) "a party claims a special knowledge or expertise in the law and induces another to rely on the claimed knowledge or expertise." *Id.* at 320. Although the Hostetlers cite both exceptions, they only argue that the second applies:

> The undisputed evidence establishes that the Hostetlers looked primarily to Mr. Parker from the beginning of the business relationship for guidance in all aspects of managing their partnership and The Farm because of the Hostetlers' limited experience in business and in real estate transactions. . . . The Parkers . . . were both college graduates and had attended numerous real estate and investment seminars as part of a self-directed educational effort. The Parkers also had over 20 years experience in buying and selling real estate for investment purposes.
> . . . Although Mr. Parker had no formal legal or accounting training, he prepared a number of legal documents as part of his role as the financial partner in The Farm, including two Illinois land trust agreements. *Based on Mr. Parker's claimed, and actual, expertise in real estate investments*, his misrepresentation regarding the tax consequences resulting from not only the initial formation of the partnership and the land trusts, but also from the increased tax burdens resulting from the amendments to the trust constitute actionable fraud.

(DE #98 at 8-9/15-16, emphasis added.) The Hostetlers' argument, then, is that they relied on their own belief that the Parkers were experts in real estate transactions—but

they have cited no evidence at all showing that either of the Parkers claimed special

expertise or knowledge in tax law. Thus, the exception is inapplicable.

As to breach of fiduciary duty, the Hostetlers state that partners owe each other

the "fiduciary duty to . . . to act in the utmost good faith and loyalty." (DE #98 at 9/16.)

They inexplicably cite *Porter County Development Corp. v. Citibank*, 855 N.E.2d 306, 311

(Ind. Ct. App. 2006) in support, which is not a case involving partners and contains no

mention of such a duty. The only Indiana case the court can find mentioning a duty of

"utmost good faith and loyalty," is *Barth v. Barth*, 659 N.E.2d 559, 561 n.6 (Ind. 1995),

and it did so by equating Indiana's standards for shareholders in closely-held

corporations to those in Massachusetts, quoting the Supreme Court of Massachusetts'

explanation that the duty, like that for partners, is one of utmost good faith and loyalty.

In their reply argument the Parkers do not quibble with that phrasing of the

duty, and "shareholders in a close corporation owe each other duties analogous to

partners in a partnership," *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 241 (Ind. 2001),

so for the purposes of the parties' arguments that phrasing will be used. Although the

Parkers accept utmost good faith and loyalty as the standard for partnership fiduciary

duty, in reply argument they refer to their opening memorandum and reiterate their

assertion that they owe no fiduciary duties to the Hostetlers in regard to their personal

affairs: "the Hostetlers simply cannot extend the general 'good faith and loyalty'

fiduciary duty to cover individual responsibilities outside of the partnership. An

individual partner is responsible for his own tax liabilities, which are separate and distinct from partnership liabilities." (DE #108 at 4.)

In their opening memorandum the Parkers supported this argument by citing *United States v. Harvey*, 68 F. Supp. 2d 1001, 1009 (S.D. Ind. 1997), which stated only that the bankruptcy of a partnership "does not affect the partners' individual liabilities as the two are separate entities." From this the Parkers *ipso facto* assert: "Hence, a partner owes no fiduciary duty to another partner with respect to the individual partner's liabilities." (DE #77 at 6/15.) This argument is absurd,[9] given that virtually every Indiana case the court has found states that the "fiduciary relationship between partners requires each partner to exercise good faith and fair dealing in partnership transactions *and toward co-partners*," *In re Rueth Development Co.*, 976 N.E.2d 42, 53 (Ind. Ct. App. 2012) (emphasis added, *citing Ruse v. Bleeke*, 914 N.E.2d 1, 11 (Ind. Ct. App. 2009)); *see Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind. 1998) ("Indiana courts have characterized closely-held corporations as 'incorporated partnerships' and as such have imposed a fiduciary duty upon shareholding 'partners' to deal fairly not only with the corporation but with fellow shareholders as well."). In short, the Parkers cannot obtain summary judgment based on the argument that their fiduciary duties extend to partnership liabilities only, not to their partners personally.

---

[9] The court notes that the Parkers' counsel has in several filings complained that the Hostetlers' counsel misrepresents cases and makes unsupported arguments. This interpretation of *Harvey* and argument concerning partners' fiduciary duties is conduct in the same vein.

This leaves the Parkers' arguments that any fiduciary duty owed the Hostetlers cannot be expanded to hold Leland Parker to the same standards as a lawyer or accountant, and that, in any event, the undisputed facts show that the Hostetlers did not rely on Leland Parker's statements in managing their tax affairs, so no harm was caused. As to the first part of these propositions, the scope of fiduciary duties depends on the relationship between the parties, *see Holtz v. Hilliard*, 1 F. Supp.2d 887, 894 (S.D. Ind. 1998) (declining to expand fiduciary duty of IRA trustee to include acting like an estate-planning attorney), and the Hostetlers have asserted here only that the Parkers' fiduciary duty was to act in the utmost good faith and loyalty. Along with that, because the Hostetlers make no response to the Parkers' argument that Leland Parker should not be held to the same standard as an attorney or accountant, they apparently concede that issue. Their response boils down to one argument: "if Mr. Parker did not expect the Hostetlers to rely on those [tax advice] statements, he had a fiduciary duty to inform his partners that they should not rely on those representations." (DE #98 at 9-10).

This is essentially the flip-side of the Parker's argument that no harm was caused because the Hostetlers did not rely on those statements. This argument is based on the assertion (Parkers' Statement of Undisputed Facts, DE #76 at ¶ 24) that Gail Hostetler conceded during her deposition that the Hostetlers did not rely on tax advice given by Leland Parker. What she said was: "Didn't rely on him [Parker] for anything for our personal tax advice. Did rely on him for tax advice for Fisher Trust and Signature One Trust." (Second G. Hostetler Dep. at 150, DE #76-7 at 11.) This was in further

explanation of her "yes and no" response to the question: "Prior to going to Mr. Frischkorn [the Hostetlers' accountant], were you relying entirely on Mr. Parker for all of your tax advice?" (*Id.*) Thus, her statement doesn't bear the weight the Parkers put on it, because she asserts the Hostetlers were relying on Parker's advice with respect to the Fisher Trust, which did ultimately cause personal tax consequences to the Hostetlers.[10]

Obviously what Leland Parker said to the Hostetlers is disputed, but for the purposes of the Parkers' motion, the court must credit the Hostetlers' version. Gail Hostetler testified in her deposition that Leland Parker told them that they were to "rely on him for everything" and not seek outside tax or accountant advice, and he specifically stated that there were "no taxes due on The Farm, that nothing needed to be done." (Second G. Hostetler Dep. at 122, DE #76-7 at 9). The Hostetlers' theory is that these misrepresentations, along with actions such as making Ronald Hostetler the sole beneficiary of the trust and the Parker IRA a lender, were all part of the Parkers' scheme to avoid taxes by placing them, and the entire risk of the Project, on the Hostetlers.

Without imposing any fiduciary duty upon Leland Parker to act as an accountant or attorney, there is a question of fact under all the circumstances whether the Parkers breached a fiduciary duty to act in good faith and fair dealing with their partners, the

---

[10] In addition, in the context the Parkers have given the court, it is not clear what is meant by "prior to going to Mr. Frischkorn," as he had been the Hostetlers' accountant since the mid-1990s. (Second G. Hostetler Dep. at 122, DE #76-7 at 9.) Presumably the question meant prior to consulting him in 2006 (*see* Gail Hostetler Aff., DE#99-2 at 14-15/13-14,), but this is not absolutely certain from the deposition excerpt provided.

Hostetlers. Therefore, the Parkers' request for summary judgment on the Hostetlers' breach of fiduciary duty claim will be denied.

### 2. Regarding damages other than tax liabilities

Assuming they would get a summary judgment as to the Hostetlers' tax-liability damages, the Parkers argue that the Hostetlers have no other ascertainable damages, so no other injury caused by any fraud or breach of fiduciary duty for which to pursue a damages remedy. The Hostetlers argue that along with damages for their tax liabilities, they have four additional items of damages: Hostetler Lawn & Landscaping's investment interest of nearly $300,000 in The Farm; the value of their sweat equity; their portion due of an unpaid loan from a line of credit at the First State Bank of Middlebury; and lost future profits. (DE #98 at 18/25.)[11]

The court has already explained above that the Parkers are entitled to summary judgment on the fraud claim seeking damages for tax liabilities. After discovery was reopened at the Hostetlers' request, they dropped their damages claims for sweat equity value and lost profits. (DE #131-1 at 3.) That leaves only the Hostetler Lawn & Landscaping's investment claim, and the Hostetlers' portion of an unpaid loan from a bank line of credit to consider.

_____

[11] The Hostetlers add as an afterthought that they will be entitled to approximately $150,000 in attorney's fees, as provided in the trust agreements, should they prevail in this litigation. (*Id.*) Obviously, possible recovery of attorney's fees as a prevailing party is not an element of damages for any underlying fraud or breach of fiduciary duty.

As to the value of Hostetler Lawn & Landscaping 's investment, at the time the Parkers' motion for summary judgment was filed the Hostetlers had admitted that neither they nor Hostetler Lawn & Landscaping had been divested of their/its investment in The Farm. (Hostetlers' answers to interrogatories, DE #76-8 at ¶¶ 14(g), 15, Subsequently, however—and also going to damages for the Hostetlers' portion of an unpaid loan against a bank line of credit—The Farm was sold at auction as a result of the First State Bank of Middlebury ("FSBM") foreclosing the line of credit after its demand for repayment was not met.

Dean Miller, FSBM's Vice President of Loans, testified in his deposition that the bank would foreclose on its collateral if personal guarantees were not renewed on an unpaid line of credit. (DE #76-22 at 51/9). The Hostetlers revoked their personal guarantees on the line of credit. (*Id.* at 52/9; DE #76-23.) Before FSBM received the Hostetlers' revocation, it intended to renew the line of credit. (DE #76-22 at 57/11.) Leland Parker requested that FSBM allow him to personally guarantee the line of credit and the bank would have considered that, but the Hostetlers would not approve. (*Id.* at 60-62/11-12.) Before proceeding with foreclosure, FSBM told the Hostetlers that if they would renew their personal guarantees and they and the Parkers pay accrued interest, the bank would consider the loan current. (*Id.* at 64-66/12-13.) The Hostetlers' revocation of their personal guarantees was a primary reason the line of credit was not renewed. (*Id.* at 69/14.) In short, based on the undisputed facts, Hostetler Lawn & Landscaping lost its (and the Hostetlers their) investment in The Farm, and the

Hostetlers have liability on the unpaid loan against the line of credit, because of their unilateral decision to revoke their personal guarantees to FSBM. For that reason those damages are not caused by any alleged fraud/breach of fiduciary duty by the Parkers, and the Parkers are entitled to summary judgment.[12]

## Breach of Trust Claims

The Parkers seek summary judgment on some of their breach of trust claims against Gail Hostetler, mainly regarding her duties as trustee of the Signature One Trust and pertaining to funds from a timber sale. The timber was harvested and sold from lots in The Woods, the portion of the Project owned by the Signature One Trust. It is undisputed that the proceeds from this sale, $39,580, were deposited by Gail Hostetler into the Hostetler Lawn & Landscaping checking account. Thereafter it was, according to the Hostetlers, used to pay expenses for The Farm, which was owned by The Fisher Trust.

First, The Parkers argue that this amounts to a conflict of interest and self-dealing because Hostetler Lawn & Landscaping was (partially) owned and controlled by the Hostetlers. Thus, the Indiana Trust Code was violated because it required prior court authorization. Specifically, at the applicable time, the Trust Code provided:

---

[12] The Parkers have also argued a number of reasons why the fraud claims fail as a matter of law, primarily because of a lack of detrimental reliance. (DE # 77 at 15/24 - 25/34). Because the court grants summary judgment on the basis that the Hostetlers have not shown ascertainable damages, those arguments will not be discussed.

> If the duty of the trustee in the exercise of any power conflicts with his individual interest or his interest as trustee of another trust, the power may be exercised only with court authorization.

Ind. Code § 30-4-3-5(a) (2004).

Second, the Parkers argue that Gail Hostetler violated the Indiana Trust Code by using funds belonging to the Signature One Trust to benefit The Fisher Trust, thereby improperly commingling funds in violation of Ind. Code § 30-4-3-6(b)(5)-(6).

Third, as to both trusts, the Parkers argue that Gail Hostetler failed to keep accurate accounts, provide annual written accountings, and/or to respond to requests for information pertaining to the trusts, in violation of provisions of the Trust Code. Ind. Code § 30-4-3-6(b)(6)-(7);  Ind. Code § 30-4-5-12(a).

Fourth and last, the Parkers argue that because of the above breaches, the court should summarily remove Gail Hostetler as trustee, and award attorneys fees, costs and interest to Lincoln Landmark Properties, Inc., their corporation which is a member of the Development Group, LLC. The Development Group is the beneficiary of The Signature One Trust, which owns The Woods.

The Hostetlers' first argument in response is that the Parkers are not the real parties in interest and so cannot bring any of these breach of trust claims against Gail Hostetler. The real party in interest, the Hostetlers argue, is the Development Group, LLC, because it is undisputed that on January 1, 2007, Lincoln Landmark Properties assigned all of its rights, title and beneficial interest in the Signature One Trust to the Development Group, and it is not a party to this action.

The Hostetlers previously moved to add the Development Group as an indispensable party pursuant to Fed. R. Civ. P. 19(b). The court denied that request, finding that its presence would have destroyed complete diversity, and that its interests are adequately represented in this litigation because the Parkers and the Hostetlers are (ultimately) its 50-50 owners. (DE #54.) For that and the other reasons given in that order (*e.g.*, the deadlock that would result from including a party owned equally by opposing parties), and because Indiana recognizes that shareholders/owners of closely-held corporations can bring direct actions, *Barth*, 659 N.E.2d at 562, the Hostetlers real-party-in-interest argument is no argument at all. For the same reasons, the portion of the Hostetlers' cross-motion for summary judgment on the breach-of-trust claims arguing that the Parkers are not the real parties in interest, is denied.

Second, the Hostetlers argue that summary judgment can't be granted because there is a question of fact as to whether the claims are barred by the applicable statutes of limitations, that is, the two-year statutory period applicable to breach of trust claims, now found in Ind. Code § 34–11–2–4, see *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 562 (Ind. 1992), and another one-year period incorporated into the trust agreements. Under the Hostetlers' version of the facts, Gail Hostetler and Leland Parker discussed the timber sale by phone in late March or early April 2004 (Gail Hostetler Aff., DE #99-2 at ¶¶ 17-18), and Leland Parker specifically instructed that the proceeds of the sale be deposited in Hostetler Lawn & Landscaping's checking account, the action the Parkers now claim was a breach of the Gail Hostetler's duties as trustee. The Parkers

first sued for breach of trust in an amended complaint filed September 8, 2008, more than four years later.

Although the Parkers deny the phone call ever occurred and maintain that they first learned of the alleged misuse of the timber proceeds in 2007, they argue that even accepting the Hostetlers' version of the facts, the action was still timely. This is, they argue, because:

> The statute of limitations in breach of trust claims does not begin to run "until the trustee openly disavows or repudiates the trust . . . and clearly and unequivocally sets up a right and interest adverse to the beneficiary [], which fact is made known to the beneficiary." *Forth v. Forth*, 409 N.E.2d 641, 644 (Ind. Ct. App. 1980); *see also Colbo v. Buyer*, 134 N.E.2d 45, 51-52 (Ind. 1956); *Hamrick v. Indianapolis Humane Soc., Inc.*, 174 F. Supp. 403, 407 (S.D. Ind. 1959). "Prior thereto, the possession of the trustee is presumed to be that of the beneficiary." *Forth*, 409 N.E.2d at 641; *see also Thornburg v. Buck*, 41 N.E. 85, 86 (Ind. App. 1895).

(DE #108 at 6/6.) This does not misstate the cases cited, but those cases might not accurately reflect the state of the law of Indiana, as they give scant consideration to the matter.

In *Forth* the rule is stated,[13] only to mention that it does not apply because it applies to express trusts and a constructive trust was at issue. 409 N.E.2d at 644. *Forth* cites *Terry v. Davenport*, 112 N.E. 998 (Ind. 1916), as the basis for the rule, a case which supports it only with a secondary authority, WOOD ON LIMITATIONS, *Id.* at 102, which, it

---

[13] *Colbo* also states the rule, but it appears to be dicta because the appellate decision below, 125 N.E.2d 724 (Ind. App. 1955), does not address it and it appears not to have been an appellate issue. *Hamrick* mentions the rule, only to state that it "has no application to the present case." 174 F. Supp. at 408.

appears, was last published in 1916. The rule is also inapplicable in *Terry* because the case involves a constructive, not express, trust. *Id.* at 1002. To get to the point, a long trail of research leads to *Jones v. Henderson*, 49 N.E. 443, 444 (Ind. 1898), which explains that the rule was developed as an exception to the general rule that express trusts were subject to *no* statute of limitations *whatsoever*, because possession of the trustee was the same as possession of the beneficiary, unless the trust was expressly disavowed so that it ceased to exist. It should also be noted that the rule was established when there was a distinction between equity, applicable to trusts, and law. It seems doubtful, therefore, that in a more modern era where the Indiana legislature has abolished that distinction and adopted statutes of limitations applicable to express trusts that the rule has any continuing vitality.

Assuming that the rule continues to exist, however, because it is not this court's prerogative to ignore a state rule which state courts still recite as existing, the rule nevertheless does not save the Parkers from potential application of the statute of limitations. This is because a much more recent case directly contradicts their position:

> [T]he Beneficiaries zealously argue the Trustee cannot rely on the defense of the statute of limitations to bar their action because the Trust has not ended nor has it been repudiated by the Trustee. We disagree with the Beneficiaries.
>
> The Beneficiaries' argument is correct as far as it goes; all the Indiana cases we have found in our careful research indicate that the statute of limitations will not run against the enforcement of a trust or recovery of trust res until repudiation. However, as the Trustee astutely points out, all these cases specifically deal with the problem of *enforcement* of the Trust and not of damages for a *breach* of trust as here. As these cases rationalize the delay of the statute of limitations, the trust beneficiary has no claim to

the possession of the trust property nor reason to otherwise enforce the trust until the trustee repudiates the trust and asserts personal ownership of its assets. *E.g., Jones v. Henderson, supra; Forth v. Forth, supra*. In the general scheme of things, the conclusion to hold up the running of the statute of limitations makes sense: a beneficiary's cause of action for enforcement or repossession does not accrue until repudiation or other termination of the trust. *Pugh v. Miller* (1890), 126 Ind. 189, 25 N.E. 1040. But, this conclusion is not transferable to the case here where the cause of action for breach of trust and damages accrued upon occurrence.

*Mack v. American Fletcher Nat. Bank and Trust Co.*, 510 N.E.2d 725, 737 (Ind. Ct. App. 1987). In other words, if the phone conversation alleged by the Hostetlers occurred as described in 2004, the Parkers' breach of trust claims were discovered and accrued then, making their action untimely.

The court notes that this boomerangs to another position the Parkers have taken, which is that the phone call can't be used to show that they acquiesced to the breach, thereby forfeiting their claim, because the Indiana Trust Code imposes strict liability and does not allow beneficiaries to acquiesce. As structured, the Parkers argument on the phone call is a two-headed coin: the phone call shows you were doing what I asked you to do, so there is no breach which starts the limitations period, but you could not legally do what I asked you to do, so I'm suing you for doing it even though I knew about it and consented.

The court will not countenance this win-win argument. As the Parkers' observed when arguing that the Hostetlers can't sue for fraud based on a misrepresentation of law, because everyone is presumed to know the law, the Parkers knew at the time of the phone call (if it occurred) that Gail Hostetler was breaching her duties as a trustee

under the strict-liability rule of the statute, and the statute of limitations began to run then. Because the applicability of the statute of limitations turns on a disputed issue of fact, the alleged phone conversation, the Parkers cannot get a summary judgment on their breach trust claims. This also means that the court will not give them a summary disposition on their claim to remove Gail Hostetler as trustee and award costs and attorneys fees.

In their cross-motion the Hostetlers make two additional arguments for granting a summary judgment to them on the statute of limitations issue. First, they argue that the contractual statute of limitations in the trust agreements stating that an action must be brought within one year after the date "the cause of action actually accrued" means that an occurrence, not discovery, accrual date was intended, or if the language is ambiguous it should be construed against Leland Parker, the drafter. Although the term "accrued" is not defined in the contract, there is no reason to think the parties would intend for it not to be used in accordance with its common meaning in Indiana tort law. *Cf. New Walton Homes v. Eckman*, 830 N.E.2d 32, 33-34 (Ind. 2005) (declining to incorporate discovery rule into contract stating that action must be brought within one year after "occurrence" of breach). Thus, the one-year period in the trust agreement here incorporates Indiana's discovery rule, and because there is a question of fact as to when discovery of the breach occurred, summary judgment on the issue cannot be granted.

Second, the Hostetler's argue that under Indiana's discovery rule a cause accrues not only when there is actual discovery of a breach, but also at the time that a breach would have been discovered in the exercise of due diligence. "We hold that the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, *in the exercise of ordinary diligence*, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992) (emphasis added). The Hostetlers point to evidence of record which the court need not reiterate here, showing that the Parkers knew that the timber had been cut in 2004 and should have done more to investigate where the money had gone at that time.

However, that same evidence shows there is a question of fact as to whether Gail Hostetler denied that any money had been received. For example, Linda Parker testified that when she asked about the money twice in 2004 Gail told her it had not been received yet because the logs "had to lay there for a while" and then somebody would come and measure them to finalize a price. (L. Parker Dep., DE #110-5 at 117/7 - 118/8.) When parties are in a fiduciary relationship such as trustee/beneficiary, failing to disclose information as to which there is a duty to disclose can be a sufficient act of concealment to toll the statute of limitations. *Malachowski*, 590 N.E.2d at 563. (Ind. 1992). There are simply too many disputed issues of fact in this case as to who said what and when they said it to be able to say as a matter of law that the Parkers failed to use due

diligence regarding discovery of the proceeds from the timber sale. The Hostetlers' motion for summary judgment on the statute of limitations will be denied.

**Punitive Damages**

The Parkers argue that they are entitled to summary judgment on the Hostetlers' claim for punitive damages because the Hostetlers have no compensatory damages. It is true that punitive damages cannot be awarded where no compensatory damages are awarded, *Skinner v. Martin*, 455 N.E.2d 1168, 1171 (Ind. Ct. App. 1983), but the Parkers' argument is based on the assumption that they would obtain summary judgment on every aspect of damages, including the claim for tax liabilities resulting from alleged breach of fiduciary duty, as to which the court is denying summary judgment. Thus the Parkers' argument on punitives becomes essentially one sentence, which is that the Hostetlers haven't shown the type of conduct which would allow them: "Punitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, over-zealousness, mere negligence or other human failing.'" *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 868 (7th Cir. 1994) (DE #77 at 25/34 (internal citations omitted)); *Gresser v. Dow Chemical Co., Inc.*, 989 N.E.2d 339, 349 (Ind. Ct. App. 2013).

Whether conduct is sufficient to justify an award of punitive damages is usually a factual question for the jury to decide. *Gresser*, 989 N.E.2d at 349. Here, the alleged misrepresentations Leland Parker made regarding the Fisher Trust's tax obligations

create an issue of fact regarding punitive damages. The Parkers' request for summary judgment on punitive damages will be denied.

**Indemnification**

The Hostetlers have pleaded a claim for indemnification of attorneys fees Gail Parker has incurred as trustee, and for any damages she (as trustee) may be required to pay that are not the result of bad faith or gross negligence. The Parkers request summary judgment, citing *Pflanz v. Foster*, 888 N.E. 2d 756, 759 (Ind. 2008) as holding that a claim for indemnification cannot be brought until the underlying liability on which it rests has been established by a judgment or a binding settlement. The Hostetlers respond that their claim is ripe because they have already paid attorneys fees, for which the trust agreements give Gail Hostetler a right to indemnification, and that under Indiana law the claim must be brought as a compulsory counterclaim. *See Lear Resources, Inc. v. Uland*, 485 N.E.2d 134, 137 (Ind. Ct. App. 1985).

The Parkers respond that the cases cited by the Hostetlers pre-date *Pflanz* and are "arguably" no longer good law, but in any event, if the Parkers are entitled to summary judgment on their claims that Gail Hostetler breached her duties as trustee, then the argument she is entitled to indemnification under the trust agreements is moot. The court has explained above the reasons why the Parkers do not receive summary judgment on those claims, so that does not moot the Hostetlers' indemnification claim.

"In contribution or indemnification cases, the damage that occurs is the incurrence of a monetary obligation that is attributable to the actions of another party.

That is why, generally, parties bringing contribution and indemnification claims must wait until after the obligation to pay is incurred, for otherwise the claim would lack the essential damage element." *Pflanz*, 888 N.E.2d at 759. 756, 759 (Ind. 2008). Here the Hostetlers have already incurred an obligation to pay attorneys fees which is potentially subject to the indemnification clause. The Parkers' motion for summary judgment on this aspect of the claim will be denied.

**Declaratory Judgment Regarding January 2007 Amendment of Assignment**

The court discussed above documents signed on November 29, 2005, amending the Fisher Trust, when addressing the Parkers' argument that the Hostetlers' cannot obtain reformation of those amendment documents. It is undisputed that on January 12, 2007, Ronald Hostetler signed an "Amended Assignment of Beneficial Interest" (DE #76-20) purporting to make further modifications clarifying that the original assignment was not intended to be of Ronald Hostetler's entire beneficial interest, but only of a security interest as collateral. The Parkers' seek summary judgment on their claim for a declaration that the January 12, 2007, Amended Assignment is a valid and binding contract, and that under its terms, Ronald Hostetler is liable for any deficiency judgment resulting from the foreclosure sale of The Farm.

The Parkers argue that although the Hostetlers dispute the validity of the November 29, 2005 amendments, "they have no defense to the Amended Assignment signed by Mr. Hostetler on January 12, 2007. His own attorneys prepared the Amended Assignment, and he signed it with full knowledge of all terms in the prior November

2005 Agreements." (DE #77 at 29/38.) The Hostetlers' response is twofold. First, that Leland Parker fraudulently induced Ronald Hostetler to enter into the January 2007 amendment by continuing to represent that he had no intention ever to enforce the 25% interest rate or the January 2010 due date, that those provisions only existed so that the entire arrangement would "pass muster" with the IRS. Second, that regardless of fraudulent inducement, the January 2007 amendment is unenforceable because of a complete absence of any consideration for it, or that the portion of it making Ronald Hostetler personally liable for any deficiency is unenforceable because it is a "scrivener's error." These latter arguments are more fully made in their cross-motion for summary judgment than in their response.

As to the argument that the amendment was fraudulently induced, the Hostetlers have not cited evidence of record supporting their assertions of inducement. More to the point, the Parkers in reply have cited portions of Ronald Hostetler's depostion in which he testified that he remembered nothing about the 2007 amendment, such as who drafted it, who asked him to sign it, or why he signed it. (Ronald Hostetler Dep. DE #110-3 at 140-141/4-5; 183-4/6.) The Hostetlers cannot manufacture an issue of fact now by contradicting that testimony, *see Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993); and again, there is no contradiction, because the assertions about Leland Parker's representations are not supported by any evidence of record such as an affidavit from

Ronald Hostetler. The Hostetlers cannot avoid summary judgment based on the argument that the January 2007 amendment was fraudulently induced.

This leaves the Hostetlers' arguments that the January 2007 amendment fails because it is not supported by any consideration, or unenforceable as to Ronald Hostetler's personal liability due to a scrivener's error. The alleged scrivener's error pertains to paragraph 2 of the amendment, which states in part that "Assignor [Ron Hostetler] shall be and remain liable for any deficiency remaining after applying the proceeds of disposition of the collateral . . . to the satisfaction of the indebtedness hereby secured." (DE #76-20 at 2/3.) Attorney Hayes, who prepared the document,[14] states in his affidavit that he mistakenly used the word "Assignor" where he meant to say the "Fisher Trust," because his understanding of the parties' intent was that they never intended for Ronald Hostetler to be personally liable for any deficiency.

A scrivener's error permits reformation of an agreement only when there is evidence that both parties were mistaken as to the contents of the agreement. *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 130 (In. Ct. App. 2005). As the Parkers argue, there is simply no evidence, disputed or otherwise, showing that Leland Parker was mistaken as to the contents of the amended agreement. Hayes spoke with Leland Parker only to confirm that the parties' intent had been for Ronald Hostetler's assignment to serve as collateral; he then "independently drafted" the amendment and when it was

---

[14] The Parkers argue that Hayes was the Hostetlers' attorney and acting for them. Hayes maintains that he was acting as an attorney for The Farm and not on behalf of one party or the other. (DE #110-15 at ¶ 6.)

completed sent it to both Leland Parker and Ronald Hostetler. (DE #110-15 at ¶¶ 9, 10.) Parker signed and accepted the document as it was written, with no misunderstanding of the provisions therein. (Leland Parker aff., DE #110-7 at ¶¶ 9-13.) Because there is no evidence of a mutual mistake, the Hostetler's argument for scrivener's error does not preclude enforcement of the amendment as written.[15]

It comes down to consideration. The Hostetlers' argument is essentially that because there was no consideration for the November, 2005, assignment, there would be no consideration for an amendment intended only to clarify the earlier amendment; and second that there was no consideration for the new provision making Ronald Hostetler personally liable for any deficiency.

The Parkers' argument is:

> Mr. Hostetler received an outright benefit by receiving back his beneficial interest in The Farm. But at the very least, the 2007 Amended Assignment clarified what Mr. Hayes claims was uncertain – that Mr. Hostetler's earlier November 2005 Assignment was intended to serve as collateral for the loan from Mr. Parker, and that Mr. Hostetler did not mean to give up his beneficial interest in the Fisher Trust. Relieving Mr. Hostetler of this uncertainty is consideration.

---

[15] In addition, as the Parkers argue, Hayes's claim that there was a scrivener's error makes little sense on its face, because "disposition of the collateral" would be the sale of The Farm, meaning that the Fisher Trust would never have anything left to satisfy a deficiency. Although this could have made sense to Hayes since he thought that the parties never intended for Ronald Hostetler to be liable for a deficiency—in effect, no party would be liable for a deficiency—it would not have made sense to Leland Parker under his asserted understanding that he was giving up an intended 100% beneficial interest assignment for an "as-collateral-only" assignment.

(DE #109 at 5) (footnote omitted). Based on the court's analysis herein, the enforceability of the November 2005 amendment is in question. If the November 2005 Amendment becomes unenforceable, them there is no need to give back to Ronald Hostetler's his beneficial since it never was given away, nor is there a need to clarify an earlier which no longer exists. The grant of declaratory relief is a matter within this court's sound discretion. *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 985–86 (7th Cir. 2010). Because the validity of the 2005 assignment is in question, the court will not exercise that discretion to grant a declaratory judgment in summary fashion now.

**Issues Raised in the Hostetler's Cross-motion for Summary Judgment**

*1. Conversion*

The Parkers' claim that the Hostetlers committed criminal conversion under Title 35, Article 43, Chapter 4 of the Indiana Code by spending Project funds for their own personal purposes. Ind. Code § 35-43-4-3. (First Supplement to Second Amended Complaint, DE #92, at ¶ 56.[16]) Criminal conversion requires an act by which a person "knowingly or intentionally exerts unauthorized control over property of another

---

[16] The Parkers cite the chapter of the Indiana Code pertaining to criminal conversion, and Section 8 of the Trust imposes liability only if the trustee acts with gross negligence or in bad faith. (The court cannot find the Trust document in the record, but the Parkers have not objected to the Hostetlers' quotations of its terms.) Good faith is not a defense to the tort of civil conversion. *Computers Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995). Thus, the Hostetlers argue that the Parkers are alleging criminal conversion because the Trust insulates Gail Hostetler from liability if she did not have a *mens rea* equating to criminal conversion. The Parkers have not made an argument in opposition to this point.

person." Ind. Code § 35-43-4-3. "Unauthorized" means, as relevant here: "(1) without the other person's consent; [or] (2) in a manner or to an extent other than that to which the other person has consented." Ind. Code § 35-43-4-1(b).

Specifically, the Parkers allege that payments to an accounting firm (Management & Tax Service/Richard Frischkorn) were for personal tax planning; payments to Yoder, Ainlay & Buckingham/attorney Hayes to create LLCs were personal expenditures because only the Hostetlers wanted the LLCs to be created; one payment of over $7000 to Gail Hostetler supposedly to reimburse project expenses but they are not adequately documented; three payments totaling over $9000 to Hostetler Lawn & Landscaping or Gail Hostetler personally are not substantiated by any invoices, records or receipts; and payment to accountants Burnham & Beyler were for an opinion letter obtained only to gain leverage in negotiations to buy out the Hostetlers' interest. (First Supplement to Second Amended Complaint, DE #92, at ¶ 48.)

The Hostetlers argue that undisputed evidence establishes that all of these payments were properly made for Project-related expenses consented to by Leland Parker, and many of the payments were expressly authorized by him, while others were made in accordance with Gail Hostetler's authority and discretion deriving from the express terms of the Fisher Trust. (DE #101 at 20/25 - 21/26.) Those terms—drafted by Leland Parker—have been set out by the Hostetlers in their brief and need not be repeated here; it suffices to say that they gave Gail Hostetler broad discretion to manage the property and spend money in regard to it, employing the services of those she

found it expedient to utilize, unless directed otherwise, in writing, by the Trust's beneficiary.

First, as to the payments to made to Management & Tax Service/Richard Frischkorn and Yoder, Ainlay & Buckingham/attorney Hayes, the Hostetlers argue that the undisputed evidence shows that these payments all were incurred planning the reorganization of the Project into the LLCs and creating those entities, and shows that Leland Parker authorized that work by participating in that planning and creation and meeting with principals of both firms; that he expressly authorized a payment of $6000 of those expenses; and that Gail Hostetler's powers, rights and duties as trustee gave her the authority to incur and pay those expenses regardless.

The Parkers' response is that the Hostetlers have exaggerated his involvment in planning and creation,[17] and the email which they characterize as him authorizing a $6000 expenditure on the matter does not: he explained in his deposition that he was referring to a $6000 item for professional fees in a budget that Gail Hostetler submitted to him, but he had no idea what those professional fees were for, (Leland Parker Dep., DE #99-12, at 397-400/42), creating a factual dispute as to whether he authorized the

_____

[17] For example, although Gail Hostetler says that Leland Parker was there at the time Frischkorn recommended establishing the LLCs (Gail Hostetler Dep., DE #110-9, at 91/13), Parker denies ever meeting or speaking with Frischkorn on the subject. (Leland Parker aff., DE #110-7 at ¶ 38.) Parker also maintains he only met with attorney Hayes once, because Gail Hostetler insisted, but Hayes states that he and Parker met on other occasions, and had telephone conversations regarding the formation of the LLCs. (DE #110-15 at ¶ 14.) It suffices to say that the extent of Leland Parker's involvement is a disputed factual matter.

payment. The Parkers' overall point, however, is that while they admit that Leland Parker consented to establishment of the LLCs, he viewed them as being established solely for the Hostetlers' personal benefit (for tax reasons and to give them protection against personal liability), and his consent does not mean that he viewed the associated professional fees as a proper expenditure from partnership/trust funds. (Leland Parker aff., DE #110-7 at ¶ 8.)

The Hostetlers' reply, in a nutshell, is that there was no reason for the Project to incur professional fees other than for the creation of the LLCs, and so Leland Parker had to know that was what the $6000 budget item was for; he cannot create an issue of fact now simply by denying he failed to understand that.[18] The court thinks it is clear that the Hostetlers have the better argument, and that the Parkers' assertion that Leland Parker's consent to reorganizing the Project by establishing LLCs did not encompass consent to pay the expenses of doing so from partnership funds is somewhat implausible. Nevertheless, there is so much disputed evidence as to what Leland Parker knew, when he knew it, what he said, what meetings he participated in, etc., that the court cannot say, as a matter of law, that a finder of fact could only decide the issue in the Hostetlers' favor. They will not be granted summary judgment on the issue.

---

[18] They also argue that tax planning was a legitimate business expense, comparing it to Leland Parker's drafting of the November 2005 amendments so that he could "pass muster" with the IRS. There is no evidence that Parker charged any expenses to the Project in connection with those amendments, making the analogy inapt.

As to the payments to accountants Burnham & Beyler, the Hostetlers argue there is no evidence suggesting this was done to obtain an opinion letter giving them leverage, instead the undisputed evidence shows that Gail Hostetler engaged the firm to review the Project's books and records only after the Parkers suggested a sale of all of the real estate to a third party, in order to prepare for that sale.

In response the Parkers point out that at that time the relationship between the parties was breaking down; and, as Gail Hostetler explains in her own affidavit, in April 2007 the Hostetlers met with a new attorney (because Hayes now felt he had a conflict of interest) and the new attorney advised them to cease all communications with the Parkers. (Gail Hostetler aff., DE #99-2 at ¶ 38.) Gail Hostetler further states that on that attorney's advice she retained Burnham & Beyler to review the books to be sure that no improprieties had occurred. (*Id.*) The Parkers argue, and the court agrees, this at least creates an inference that she obtained the accountants' review for a personal purpose, to insulate herself from liability. Moreover, soon after the Parkers learned that Gail Hostetler intended to have Burnham & Beyler review the books, Leland Parker emailed Gail Hostetler objecting to her doing so. (Leland Parker aff., DE #110-7 at ¶ 26.) In their reply the Hostetlers claim this is all nothing more than unsupported speculation as to Gail Hostetler's motives. The court disagrees, there is enough evidence to create an issue of fact, and summary judgment on the issue will be denied.

Regarding the payment of over $7000 to Gail Hostetler to reimburse undocumented project expenses and payments totaling over $9000 to Hostetler Lawn &

Landscaping or Gail Hostetler personally which are not substantiated by any invoices, records or receipts, the Hostetlers argue that "inadequate documentation" is not an element of conversion and that Gail Hostetler's affidavit, Exhibit D (titled "Reimbursements for project-related expenses") (DE #99-2 at 33-34) shows that all of the payments were properly made for Project-related expenses.

The Parkers argument in response, summed to its essence, is that Exhibit D attached to Gail Hostetler's affidavit was not turned over during discovery and presumably was created only for summary-judgment purposes, and that the lack of any underlying receipts, invoices or other documents showing that the Hostetlers actually incurred any of the claimed expenses allows an inference that they used the money for personal purposes. The Hostetlers reply is that the Parkers are quibbling about the timing of payments and claiming a lack of supporting documentation "which they have received in discovery even if they refuse to acknowledge it." (DE #115 at 5.) Unfortunately, the Hostetlers have shown none of that documentation to the court. As things stand, the Parkers' evidence that funds were misused is that they asked for proof of what the money was spent on an (allegedly) did not get it, creating an inference of misuse. Although Gail Hostetler's testimony that the funds were properly used is enough to sustain a defense against the charge of conversion, it is not enough to eliminate any dispute of fact, and so summary judgment cannot be granted.

*2. Deception*

The Parkers' claim that the Hostetlers committed deception in violation of Ind. Code § 35-43-5-3 (First Supplement to Second Amended Complaint, DE #92, at ¶¶ 60-62), by creating a false and misleading written statement (an invoice dated March 23, 2007 (DE #76-15)) for the purpose of covering up their (alleged) conversion of the funds from the timber sale, and increasing their bargaining power at the Parkers' expense. This section of the Indiana Code provides, as relevant here, that a person is liable for deception if he "knowingly or intentionally makes a false or misleading written statement with intent to obtain property, employment, or an educational opportunity." Ind. Code § 35-43-5-3(a)(2). The statute requires proof of a false and misleading written statement, *Ecker v. Rochester Ford New Holland, Inc.*, 694 N.E.2d 289, 291 (Ind. Ct. App. 1998), which can be proved entirely by circumstantial evidence. *Jordan v. State*, 466 N.E.2d 734, 735-36 (Ind. Ct. App. 1984).

The Hostetlers argue that they are entitled to summary judgment because the undisputed evidence shows that Gail Hostetler created this document when she believed that the Farm was about to be sold to a third party and in preparation for that sale. She was trying to produce an accounting showing all of the work that had been performed by Hostetler Lawn & Landscaping in 2006 and to show what had been done with the timber sale proceeds that were deposited in Hostetler Lawn & Landscaping's account.

The Parkers argue that the circumstances are suspicious because the March 23, 2007 invoice (DE #76-15) invoice purported to show work performed by Hostetler Lawn & Landscaping on The Farm in 2006. However, there had been three prior Hostetler Lawn & Landscaping invoices dated December 31, 2004; November 2, 2005; and January 1, 2006. The January 1, 2006, invoice was in the amount of $54,020.00, and despite its date, appears to have been prepared at some time later for all work performed in 2006, because that amount matches accountant Frischkorn's statement of work billed by Hostetler Lawn & Landscaping for performance in 2006. (DE #110-14 at 3.) None of these prior invoices show the timber funds, while the March 23, 2007, invoice, purportedly for services performed in 2006, discloses the receipt of those funds for the first time, "buried" at the bottom of the second page.

It also claims to be for work performed in 2006, but attaches supporting receipts for expenses incurred in 2003 and 2004, and there had already been the three prior Hostetler Lawn & Landscaping invoices for 2004, 2005 and 2006. The March 2007 invoice was not prepared until the Parkers had proposed a dissolution and the Hostetlers had proposed a sale of The Farm to a third party, and so the Parkers argue that all of the circumstances permit an inference that the invoice was fraudulently created to cover up the prior conversion of the timber funds, and to increase the proceeds the Hostetlers would realize from the sale to the third party.

The Hostetlers' reply is that the Parkers' argument is based on nothing but supposition, while the March 2007 invoice is "on its face a totally accurate accounting"

that is a "clumsy but non-deceptive attempt" to provide an accurate accounting of all of

The Farm's funds, and based on her belief that everyone concerned knew about the

timber money and how it had been used. (DE #115 at 6-7.) That may very well be the

case, but that does not establish the non-existence of a factual dispute. The timing of the

invoice, and its content, covering the same time period as prior invoices, would permit

a finder of fact to conclude otherwise, and so the Hostetlers will be denied summary

judgment on the Parkers' deception claim

## CONCLUSION

For the foregoing reasons, the Parkers' motion for partial summary judgment

(DE #74) is **GRANTED IN PART AND DENIED IN PART**. The Hostetlers' cross-

motion for partial summary judgment is **DENIED**. Because the motions could be

resolved on the written submissions, the Parkers' motion for oral argument (DE #136) is

**DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(A), FED. R. CIV. P. 72(a), and LOCAL RULE

72-1(b), the court hereby **ORDERS** that this case be assigned to Magistrate Judge

Christopher A. Nuechterlein for purposes of holding a settlement conference within 60

days of the date of this order. If that conference does not result in a settlement, the

parties are to confer and discuss agreeable trial dates in Spring 2016, then contact the

undersigned's Courtroom Deputy, Ed Ciba, at (219) 852-3464, to schedule the trial.

**SO ORDERED.**

Date: September 4, 2015

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT